J-S34003-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INT. OF: W.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: B.L., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 433 MDA 2020 |

Appeal from the Decree Entered January 21, 2020
In the Court of Common Pleas of Mifflin County
Orphans' Court at No(s): 19 of 2019

BEFORE: PANELLA, P.J., BENDER, P.J.E., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY PANELLA, P.J.: **FILED SEPTEMBER 15, 2020**

B.L. ("Father") appeals from the decree entered January 21, 2020, that granted the petition of Mifflin County Children and Youth Services ("CYS") seeking involuntarily termination of his parental rights to his son, W.L. (born September 2017) ("Child" or "the Child"), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1] After careful review, we affirm.

The orphans' court ably set forth the factual and procedural history of this matter, which we adopt in this Memorandum. *See* Orphans' Court Opinion, 1/21/20, at 1-9. In relevant part, the family was involved with CYS prior to Child's birth. N.T., 12/9/19, at 3. When Child came into care, he had

---

[1] The orphans' court also terminated the parental rights of Child's mother, R.L ("Mother"), in the same decree. Testimony established that Mother had several in-patient psychiatric placements after Child was born. *See* N.T., 12/9/19, at 4. When Mother was in contact with CYS, she repeatedly asserted that the best placement for Child was with his foster parents. *See id*., at 6. Mother did not file an appeal, nor has she participated in this appeal.

medical needs. Child had corrective penile surgery in May of 2018 and had tubes put in his ears in January of 2019. **See id**. at 14. Father was incapable of providing appropriate care for Child after the surgery, despite intensive involvement from service providers. **See id**. CYS maintains concerns that Father cannot learn to meet the daily safety needs of Child. **See id**. at 15.

On September 4, 2019, CYS filed a petition to involuntarily terminate the parental rights of Father to Child. On December 9, 2019, the orphans' court conducted an evidentiary hearing on the petitions.[2] CYS presented the testimony of Rylen Bargo, a placement caseworker and supervisor for CYS, Felicia Hackenberry, a counselor for Family Intervention Crisis Services

---

[2] Child was only two years old at the time of the adjudicatory/dispositional hearing on December 9, 2019, and was too young to express a preferred outcome. The orphans' court appointed Brian R. Baker, Esquire, as legal interests counsel and Stuart A. Cilo, Esquire, guardian *ad litem* (GAL) for Child. **See In re Adoption of L.B.M.**, 639 Pa. 428, 161 A.3d 172 (2017) (plurality), in which our Supreme Court held that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court defined a child's legal interest as synonymous with his or her preferred outcome. **See also In re T.S.**, 648 Pa. 236, 192 A.3d 1080 (2018) (filed August 22, 2018), in which the Supreme Court held that that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome. We do not comment on the quality of the legal counsel's representation of the Children in this matter. **See In re: Adoption of K.M.G.**, 219 A.3d 662, 669 (Pa.Super. 2019) (*en banc*) (filed September 13, 2019) (*limited appeal granted*, December 9, 2019) (holding that this Court has authority only to raise *sua sponte* the issue of whether the trial court appointed any counsel for the child, and not the authority to delve into the quality of the representation).

("FICS"), and David G. Ray, a licensed psychologist. Father testified on his own behalf.

On January 21, 2020, the orphans' court entered the decree involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b). Father timely filed notices of appeal and concise statements of errors complained of on appeal.

On appeal, Father contends that the orphans' court improperly terminated his parental rights to Child pursuant to section 2511(a)(2), (5), and (8). More specifically, Father argues that CYS improperly barred Father from any unsupervised contact with Child based on false allegations that he had sexually abused Child. Father also complains that the orphans' court improperly relied on Father's chronic physical conditions without evidence that such physical conditions permanently prevent Father from satisfactorily parenting Child. Finally, Father contends that the orphans' court erred when it determined that termination of his parental rights was in the best interests of Child, because he and Child share a positive bond that will harm Child's emotional well-being if severed.

Our standard of review of termination cases is deferential:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often

stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

... [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re I.E.P.*, 87 A.3d 340, 343–44 (Pa. Super. 2014) (citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted). "Satisfaction of the requirements in only **one** subsection of Section 2511(a), along with consideration of the provisions in Section 2511(b), is sufficient for termination." *Z.S.W.*, 946 A.2d 726, 729 (Pa. Super. 2008) (brackets

omitted, emphasis in original). Here, we will review whether termination was proper under section 2511(a)(2) and (b).

Section 2511 of the Adoption Act provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

Under section 2511(a)(2), the moving party must produce clear and convincing evidence that: (1) the parent's conduct demonstrates repeated and continued incapacity, abuse, neglect or refusal to assume parental responsibility for the child; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the parent will not remedy the causes of the incapacity, abuse, neglect or refusal. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2) are not limited to affirmative misconduct; to the contrary, those grounds may include acts of

refusal as well as incapacity to perform parental duties.  *See In re A.L.D.* 797

A.2d 326, 337 (Pa. Super. 2002).

In the present case, the orphans' court determined that CYS established, by clear and convincing evidence, the grounds for termination of Father's parental rights.  The orphans' court explained its reasoning for termination under § 2511(a)(2):

> . . . . [Child] was adjudicated dependent on December 7, 2017 and placed in the legal and physical custody of [CYS].  [CYS] developed four Child Permanency Plans to reunite [Child] with Father.  FICS provided Father with parent education, counseling sessions, visitation, lifestyle checks[,] and transportation.  Father did not take advantage of the services offered by FICS.  While Father was consistent in his attendance with service[-]providers prior to June of 2019, Father would not consistently implement or correctly perform what he learned in his visits with [Child].
>
> Furthermore, Father struggled to complete the specific tasks FICS asked him to do during each visit with [Child].  Testimony provided Father greeted [Child] at the beginning of a visit only 18 percent of the time.  While Father did change [Child's] diaper during 89 percent of his visits, he required staff assistance to do this.  Father took the initiative to feed [Child] on 47 percent of visits, but had to be prompted by staff on several occasions.  Father burped [Child] sixty-two percent of the time and made facial expressions 4.5 percent of the time.  Father engaged [Child] with tummy time 20 percent of the time and tended to his post-surgery needs only 13 percent of the time.  Lastly, Father refrained from playing on his phone only 66 percent of the time.
>
> In refusing to take advantage of the numerous services offered to him, Father failed to meet the objectives of [CYS].  Father has a lack of insight into his inabilities and believes he has done everything he can to have [Child] returned to his custody.  Father cannot understand why [Child] has not yet been returned to his care and believes Mother is in cahoots with [CYS] to have his [rights] terminated.  Due to his lack of insight and his failure to utilize service tools, Father was never able to remedy his

behaviors and provide [Child] with an environment that will meet the child's emotional, mental, physical and developmental needs.

Based on the testimony given above, Father cannot meet [Child's] mental, emotional or physical needs. Father does not have a place for [Child] to stay, if the child would be returned to him and home conditions are still an issue. Furthermore, Father has failed to address his own medical needs and is not able to properly maintain and monitor prescribed medications. After more than two years of services, [CYS] and FICS both testified Father is not capable of providing for [Child's] physical, developmental and emotional needs.

At Permanency Review Hearings held April 23, 2018, September 10, 2018, February 11, 2019, and July 15, 2019, the [orphans' court] found Father was minimally compliant with the permanency plan and had only made minimal progress towards alleviating the circumstances which necessitated original placement. At [the] termination hearing held December 9, 2019, [CYS] had the same concerns for Father's parental capacity that they had at the time of filing for dependency. As a result, there exists a continued inability to parent [Child]. This has caused [Child] to be without essential parental care, control or subsistence necessary for his physical and mental well-being. Furthermore, due to the extended duration of this case, the [orphans' court] finds Father's incapacity cannot remedied in a timely manner. For these reasons the [orphans' court] finds by clear and convincing evidence grounds for termination of Father's parental rights pursuant to § 2511(a)(2).

Orphans' Court Opinion, 1/21/20, at 11-13.

In summary, the orphans' court determined that Father made insufficient progress towards meeting his FSP objectives. The orphans' court credited the testimony of Rylen Bargo, a placement caseworker and supervisor for CYS. Bargo testified that CYS "has ongoing concerns with Father's ability to retain information needed to meet the daily safety needs [of Child]." N.T., 12/9/19, at 15. Bargo explained further:

> This includes the proper use of [and] installation of a car seat, to date still being an issue. Observation and use of safe and clean foods and dishes. Appropriate supervision of [Child], ability to monitor his anger and frustration levels, and to follow doctor and staff direction. He's actually -- [Father] has actually some regression in skills since FICS has stopped prompting unless there's a direct safety need, safety threat to [Child].
>
> He's unable or unwilling to follow [Child's] established schedules and is unable to relate this causing [Child] to be upset and fussy during visits which in turn causes elevated anger and frustration.

*Id*.

Bargo expressed concern about Father's medical issues and that he was unable to properly maintain his health conditions and monitor his medications. *See id*. at 16-17. She also explained that Father failed to meet his objective of cooperating with CYS and other service providers. *See id*. at 20-21. At the time of the termination hearing, Father refused to provide CYS with his current address, so CYS was unable to complete a home assessment. *See id*. at 18. Additionally, she testified that Father was not honest about financial issues and the number of members of people living in the household. *See id*. at 20.

Bargo stated that Father had an indication for physical and sexual abuse through CYS and was referred to Project Point of Light. *See id*. at 38. CYS followed Project Point of Light recommendation that Father have no unsupervised contact with Child. *See id*. at 37. Project Point of Light felt this was necessary due Father's lack of progression with the case. *See id*. Bargo testified that CYS had the same concerns at the termination hearing that existed when they filed the petition for dependency. *See id*. at 21.

The parenting counselor from FICS, Hackenberry, described Father's participation in services as "very scattered throughout the entirety of this case", and clarified:

So there were times where he was very defensive and didn't want to take feedback, but then there were also times where he would stop and calm down and listen. And at least appear to be trying to get it. But he was also inconsistent [in] that one time he could do it, the next time he didn't do it. So I'm not sure if it was an [inability] or unwillingness.

*Id*. at 49-50.

Hackenberry expressed concern about the lifestyle checks FICS performed on Father, and testified that Father's home repeatedly presented safety concerns:

. . . [T]here were anywhere from 4 piles to over 23 piles of dog feces on the floor at any given time. There was scattered garbage. There was concern of a gun and bullets unsecured in a dresser drawer that [Child] could or could not have access to had he been in the home. The refrigerator, at times the refrigerator was turned on. At other times[,] it was not and there was still food in it. Then the smell and different things that would come with that. There were many different times that there were different tools laying out. Laid out on the floor. There was an axe, an axe head on the floor, diabetes supplies, [and] medications on the floor and/or within reach of [Child].

*Id*. at 72. Hackenberry emphasized that Father has not made progress in any of his objectives set forth in the FSP and opined that Father cannot meet Child's physical, emotional or developmental needs. *Id*. at 70 and 77.

The orphans' court credited the testimony of Bargo and Hackenberry. *See* Orphans' Court Opinion, 1/21/20, at 6-7. The competent, clear and

convincing evidence in the record supports the orphans' court's credibility and weight determinations, and its conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Based upon our review of the record, we conclude that the orphans' court did not err or abuse its discretion in terminating Father's parental rights to Child pursuant to Section 2511(a)(2).

Next, we must consider whether Child's needs and welfare will be met by termination under Section 2511(b). *In re Z.P.*, 994 A2d 1108, 1121 (Pa. Super 2010). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.* This Court has cautioned against a simplistic consideration of the child's needs:

> [b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Id*. at 1121 (citation omitted).  The court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.  *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).  Additionally, the court may emphasize the safety needs of a child.  *See In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008). "[A] parent's basic constitutional right to the custody and rearing of . . . [his] child is converted, upon the failure to fulfill . . . [his] parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment."  *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).  A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound.  If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists.  The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (citations and internal quotation marks omitted).

Father contends that CYS did not present clear and convincing evidence that termination of Father's parental rights was in the best interests of Child.

- 11 -

More specifically, Father argues that the orphans' court erred when it credited the testimony of the licensed psychologist, Ray, that Child would not be adversely affected if Father's parental rights were terminated.

The orphans' court concluded that terminating Father's parental rights serves Child's developmental, physical, and emotional needs and welfare:

> Upon filing for dependency, [Child] was underweight and in need of penile surgery. The child also needed tubes placed in his ears. Foster parents tended to all of [Child's] medical needs and [Child] is now meeting all of his childhood milestones and checks. [Child] also has a healthy secure attachment to his foster parents. [Child] calls foster mother and father "Mommy and Poppa" and goes to his foster parents for all of his needs. Mr. Ray testified he observed [Child] enthusiastically interacting in the foster home and engaging others in play.
>
> These interactions are vastly different from Mr. Ray's observations between [Child] and Father. Mr. Ray noted he did not observe any close interactions between Father and [Child]. Mr. Ray testified the child appeared subdued during visits and Father would sit in one place and would snap his fingers or pick up a toy and hit it across the floor, but did not interact with [Child]. Mr. Ray also noted that Father did not closely watch [Child] to ensure he did not try to mess with the tubes in his ears. Mr. Ray testified Father would leave the child unattended and FICS would be left to intervene for the child's safety. The excessive intervention by FICS was surprising to Mr. Ray as Father had already had 14-15 months of supervision and instruction.
>
> Based on his observations of visits and psychological evaluation, Mr. Ray testified there would be very little to no psychological damage to [Child] if Father's rights were terminated. By way of example, Mr. Ray noted [Child] did not have any negative behavioral issues after Father stopped attending visits with [Child] in June of 2019. Mr. Ray noted [Child] has spent ninety (90) percent of his life in the care of foster parents. [Child] only spent 77 days in the primary care of Father. Mr. Ray believes [Child] would be psychologically damaged if he would be removed the care of his foster parents.

In light of the above, the [orphans' court] finds it is in the [Child's] best interest to be placed with a family that can adequately provide for his emotional, mental and physical needs. Testimony provided [Child] is doing well in his current foster placement home. Foster parents have reported to the Agency] that they are an adoptive resource for [Child] and wish to make him part of their family. If the [orphans' court] were to maintain Mother and Father's parental rights, [Child's] developmental, educational and emotional foundation would be threatened, as he would be deprived of a permanent, healthy, safe, and secure parent/child relationship with his foster parents.

Orphans' Court Opinion, 1/21/20, at 16-17.

The competent, clear and convincing evidence in the record supports the orphans' court's conclusion that it would best serve the needs and welfare of Child to involuntarily terminate Father's parental rights pursuant to Section 2511(b). Ray attended visits between Father and Child and observed "very little interaction" and that Child "didn't seem really comfortable around his dad." N.T., 12/9/19, at 120 and 122. Notably, Mr. Ray opined that Father "cannot provide an environment that assures [Child's] health, safety, welfare[,] nor is he meeting [Child's] emotional, and physical needs." *Id*. at 124. Conversely, Ray described that foster parents "are meeting his needs. The child is healthy there. He's secure. He's loved. He's played with. He's interacted. He's given structure, and warmth, and nurturing." *Id*. at 122. Ray pointed out that Child has been in the care of foster parents for over two years and concluded that the psychological benefits of proceeding with the termination of Father's parental rights "and severing the bond far outweigh any disturbance that it would create." *Id*. at 125.

The credited testimony of Ray supports the orphans' court's conclusion that it would best serve the needs and welfare of Child to terminate Father's parental rights pursuant to Section 2511(b). Preserving Father's parental rights would serve only to deny Child the permanence and stability to which he is entitled. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) ("Clearly, it would not be in [the child's] best interest for his life to remain on hold indefinitely in hopes that [Father] will one day be able to act as his parent").

Accordingly, the trial court did not err or abuse its discretion in terminating Father's parental rights to Child pursuant to Section 2511(b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2020